## PRINCE GEORGE'S COUNTY COUNCIL ET AL.
## *v.* PRESTWICK, INC.

[No. 12, September Term, 1971.]

*Decided October 19, 1971.*

218

*Motion for rehearing filed November 18, 1971; denied December 6, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Barry S. Cramp, Associate County Attorney*, with whom were *Walter H. Maloney, Jr., County Attorney*, and *Jess J. Smith, Associate County Attorney*, on the brief, for Prince George's County Council, part of appellants. *James F. Vance*, with whom was *Donald B. W. Messenger* on the brief, for Richard H. Ichord et al., other appellants.

*Blair H. Smith*, with whom were *Smith, Finley, Gray & Ahalt* on the brief, and *Russell W. Shipley*, with whom were *Kahler, Shipley & O'Malley* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court. BARNES, J., concurs in part and dissents in part. Concurring in part and dissenting in part opinion at page 231 *infra*.

This appeal is taken from an order of the Circuit Court for Prince George's County which reversed a decision of the District Council denying the appellee's application for a zoning map amendment from R-R (Rural-Residential) to R-10 (multi-family high density residential) of the subject property. The appellants are the County Council for Prince George's County as well as certain residents and property owners in the neighborhood who oppose the change in zoning.

The original comprehensive zoning of the area, of which the subject property is a part, was accomplished in 1957. There has been no comprehensive rezoning since that date.

The appellee, Prestwick, Inc., filed an application for the rezoning of the property on July 1, 1966. Previously, an attempt to rezone the same property to R-H (multiple family high rise residential) had met with defeat in this Court in the case of *MacDonald v. Board of County*

*Com'rs,* 238 Md. 549, 210 A. 2d 325 (1965). The property consists of 26.05 acres located on the north side of Tantallon Drive and on the south side of Swan Creek, in the 560 acre planned community known as Tantallon, Prince George's County. It is isolated from other residential areas by Swan Creek and a marina, the Tantallon Golf Course, and the 341 acres of Fort Washington National Park. Once a part of it, it is now completely surrounded by the Tantallon subdivision, characterized primarily as a single-home residential area. One of the witnesses, Congressman Richard H. Ichord, described its "rural-aesthetic" ambience as, "an area, a neighborhood of peace, of quiet, of seclusion, of beautiful wooded lots, safe streets with diversified recreational activities, consisting of the golf course, the marina and the tennis courts."

Subsequent to the *MacDonald* case in May of 1965, the Planning Commission made a study of a large area of Prince George's County and a master plan for the South Potomac Sector, in which this property lies, was adopted November 1, 1967. The master plan called for 1235 multi-family density units for the 26 acre tract. The District Council, however, deleted this multi-family zoning proposed by the Planning Commission, and this action became the subject of litigation which was resolved in favor of the County Council in *Prestwick v. Bd. of County Com'rs,* in the Circuit Court for Prince George's County, Equity No. D-3009, October, 1968.

When the Planning Commission was given the present application for R-10 zoning for its review, it recommended approval relying on the classification proposed for the area in the master plan in 1967 showing multi-family use. On September 19, 1969, the District Council of Prince George's County declined to follow the recommendations of the Technical Staff and Planning Commission and denied the application for the R-10 zoning. On appeal to the circuit court, it initially remanded the case to the District Council, for the sole purpose of considering "any conditions which should be imposed on the R-10

zoning application * * * in the event that said application was granted." A reconsideration was given by the District Council which imposed certain conditions on the application (which we do not find material to this appeal). The case returned to the circuit court and a hearing was held in December of 1970, with the resulting decision and order which reversed the District Council's denial of the application. Those opposing the granting of the rezoning have brought the present appeal.

The lower court held that there had been a mistake in the original comprehensive zoning of the property in 1957, that there had been substantial change in the character of the neighborhood and therefore the District Council erred in denying the requested R-10 rezoning. The appellee also urged that the R-10 zone was actually a floating zone but the lower court held that it was not. We agree with the lower court on this latter issue but reverse its holdings, regarding "mistake and change," for reasons which become evident in our discussion of the issues raised by this appeal.

## ISSUE OF MISTAKE IN ORIGINAL ZONING

The appellee is most emphatic that we are not here presented with a reargument of the 1965 case of *MacDonald v. Board of County Commissioners of Prince George's County, supra,* however, if this case is not an instant replay of *MacDonald,* it is at least *MacDonald* revisited.

In the instant case the District Council, properly addressing itself to the application of the test of "mistake or change" to the facts at hand and by a vote of 4 to 1 found neither mistake in the original zoning nor substantial change in the character of the neighborhood, either of which is necessary to support a rezoning amendment to an existing comprehensive plan. *Messenger v. Board of County Commissioners,* 259 Md. 693, 703, 271 A. 2d 166 (1970) ; *Chapman v. Montgomery County,* 259 Md. 641, 645, 271 A. 2d 156 (1970) ; *Chevy Chase Village*

*v. Montgomery County,* 258 Md. 27, 39, 264 A. 2d 861 (1970) ; *Montgomery v. Board of Com'rs,* 256 Md. 597, 601, 261 A. 2d 447 (1970) ; *Wells v. Pierpont,* 253 Md. 554, 557, 253 A. 2d 749 (1969).

The record is not as replete as one might desire regarding evidence bearing on the issue of mistake in the comprehensive zoning, perhaps for the very logical reason that in the court below the appellee abandoned its contention that there had been a mistake in the original zoning. Nonetheless, the lower court deemed it incumbent upon it to make the issue of mistake an integral part of its opinion. It is likewise of interest to note that in *Mac-Donald, supra,* a case in which the same property was the subject of an attempt at rezoning from R-R to R-H, the applicants also failed to challenge the correctness of the original zoning of 1957. See *MacDonald* at p. 553.

The lower court in the present case, summarizing its conclusions, characterized the original zoning of the property as it appears on the 1957 comprehensive map as:

> "[N]ot the result of a plan, study or the application of any attention or expertise to the property or its immediate area. It was a pragmatic solution to a pressing problem. The action of the Council in directing deletion of the high density zone from this property from a plan which was made after careful study, public hearings and the application of qualified, objective expertise was a mistake and was arbitrary and capricious as a matter of law when unsupported by a valid reason."

It must be immediately noted that the lower court was in error in its implication or statement that the District Council had directed the deletion of a high density classification for this property from the original comprehensive zoning map of 1957. The deletion which the District Council made of the proposed high density zoning for this property was from the master plan for the South Po-

tomac Sector, which was proposed in November of 1965 and adopted on November 1, 1967. In fact, the action of the District Council in deleting this high density zone, contrary to the recommendations of the Planning Commission, was the subject of the equity suit in 1968, *Prestwick v. Board of County Commissioners,* previously mentioned. It is relevant to note that it is within the discretionary powers of the District Council to disapprove any master plan submitted by the National Park and Planning Commission. Section 59-68(e), Code of Public Local Laws of Prince George's County, 1963 Ed. (1967 Supp.) This Court has on other occasions emphasized the need of not confusing a *master plan* proposed or adopted for a certain area with that of a *comprehensive zoning plan,* as the lower court has done in this instance. *Chapman v. Montgomery Council, supra,* at 644; and *Board of County Com'rs for Prince George's County v. Edmonds,* 240 Md. 680, 684, 215 A. 2d 209 (1965).

However, out of fairness, we must comment that the lower court elsewhere in its opinion did refer, by indirection, to the 1957 comprehensive zoning map and noted that upon the enactment of Chapter 698 of the Laws of 1957, whereby the subject property and thousands of other acres came under the jurisdiction of the Maryland National Capital Park and Planning Commission, it became necessary to establish a comprehensive zoning plan between the date of the enactment of Chapter 698 on April 10, 1957, and its effective date of June 1, 1957. The court further stated:

> "No comprehensive study or considered plan was possible. To meet this situation and to establish zoning control, the entire area was zoned R-R. Thus the original zoning was not the result of study or planning applied to this specific property but was an expedient made necessary by limitations inherent in a situation created by the explosive growth of this entire Washington Suburban area."

However, in point of fact, the comprehensive zoning for the subject property was not adopted until November 20, 1957, some 7 months after the passage of Chapter 698 and it is significant that the applicable law at that time required a public hearing to be held before the adoption of a comprehensive zoning plan. (Chapter 992 of the Laws of 1943). There is little in the record which would support the assumption of lack of study or planning made by the lower court. Indeed, from the record it appears that the comprehensive zoning map, Oxon Sheets 1, 2, 3 and 4, shows substantial zoning for each classification as originally adopted.

In the course of testimony in the present litigation Mr. William R. Busbey, a representative of the Park and Planning Commission, although called as a witness for the petitioners for rezoning, testified as follows:

"Q. Would it be fair to say that you felt that the 1957 zoning map did not provide for the population explosion that came about in this area?

"A. It had the capacity to accommodate the residential development, I think it would handle the population, the numbers of population. This again, is a matter of opinion. We felt that it did not recognize the needs of a broad population, with different desires and economic abilities to acquire different types of houses. Again this is a personal feeling, but the zoning map at that time could accommodate the population we anticipated."

Again, the cross-examination of Mr. James E. Redmond, also a Park and Planning representative, reveals that as late as 1963, the Technical Staff and the Planning Board were disposed to uphold the R-R zoning of the subject property with regard to denying an application for an apartment project, as may be seen from the following colloquy:

"Q. With regard to the recommendations of the Technical Staff and the Planning Board on the apartment project in Tantallon on the Potomac, what were their recommendations in 1962 and 1963?

"A. The recommendations of the staff in all three of the applications were for denial."

Indeed, it would appear that the testimony of these two witnesses, without more, would be sufficient evidence to render the question of mistake in original zoning at least fairly debatable and thus require the court to accept the findings of the District Council on that issue. *Kirkman v. Montgomery County,* 251 Md. 273, 277, 247 A. 2d 255 (1968) ; *Agneslane Inc. v. Lucas,* 247 Md. 612, 618, 619, 620, 233 A. 2d 757 (1967) ; *Ward v. Oak Hill Farms, Inc.,* 232 Md. 274, 283, 192 A. 2d 761 (1963) ; *County Council for Montgomery County v. Gendleman,* 227 Md. 491, 498, 177 A. 2d 687, 690 (1962).

We also find relevant the language of *Wakefield v. Kraft,* 202 Md. 136, 151, 96 A. 2d 27 (1953), wherein we stated :

"There was substantial evidence to sustain the County Commissioners; whether that evidence was to be relied on, what inferences were to be drawn from it, and whether those which the Commissioners drew were right or wrong, is of no proper concern to a Court."

And, as Judge Singley pointed out, writing for the Court in *Kirkman, supra,* at p. 277 :

"The 'substantial evidence' test has been further defined and refined in later cases, including *Board v. Oak Hill Farms,* 232 Md. 274 [192 A. 2d 761 (1963)], and *Snowden v. City of Baltimore,* 224 Md. 443, [168 A. 2d 390 (1961)]. 'Substantial evidence' is held to be 'more than a scintilla' and such evidence 'as a

> reasonable mind might accept as adequate to support a conclusion' and 'enough to justify, if the trial were to a jury, a refusal to direct a verdict.' *Board v. Oak Hill Farms, supra."*

In holding that the lower court erred in finding a mistake in the comprehensive zoning of plan 1957, we are mindful of the oft repeated admonition by this Court of the strong presumption of the correctness of original zoning. *Helfrich v. Mongelli,* 248 Md. 498, 237 A. 2d 454 (1968), cases cited therein at p. 502, footnote 1.

## *ISSUE OF SUBSTANTIAL CHANGE IN THE CHARACTER OF THE NEIGHBORHOOD*

In respect to the question of substantial changes in the character of the neighborhood, the appellee's case is seriously flawed in that it fails to meet the burden of proof which it has to delineate the neighborhood. *Malmar Associates v. Board,* 260 Md. 292, 305, 272 A. 2d 6 (1971). This is true, unless we take as the definition of the neighborhood the description given by the witness Ben Dyer, which includes the entire South Potomac area. This would embrace a triangular area with a base of some $3\frac{1}{2}$ miles and side boundaries of approximately $6\frac{1}{2}$ miles. Although this Court has frequently stated that the concept of the neighborhood is a flexible one, and will vary according to the geographical location involved and that in a rural area the neighborhood tends to be larger and more fluid than in a city or suburban area (*Montgomery v. Commissioners,* 263 Md. 1), nonetheless, in the absence of supporting evidence it appears to this Court to be unreasonable to argue that the neighborhood could be as general or as extensive as here contended by the appellee. See *Board of County Commissioners v. Kines,* 239 Md. 119, 123, 210 A. 2d 367 (1965). Certainly, this Court has viewed "a change in the neighborhood" as applying to a more restricted area than is argued for by the appellee. *Goucher College v. DeWolfe,* 251 Md. 638, 645, 248

A. 2d 379 (1968); *Woodlawn Ass'n v. Board,* 241 Md. 187, 199, 216 A. 2d 149 (1966); *Bishop v. Board of County Com'rs,* 230 Md. 494, 503, 187 A. 2d 851 (1963); *Levitt and Sons v. Board,* 233 Md. 186, 191, 195 A. 2d 723 (1963), and cases cited in *Woodlawn* on pgs. 199 and 200. In *Goucher* at p. 644, Chief Judge Hammond writing for the Court stated: "The matter of the reaches of the neighborhood in a given case and how near a change must be to affect its character are primarily for the Board to determine."

A reading of the record in the instant case persuades us that the District Council considered the neighborhood to be the abutting property in the immediate vicinity of the 26 plus acre tract comprising the subject property. Certainly, Commissioners Baggett, Francois, Spellman and Brooke referred to the neighborhood area as that which had been the subject of adjudication in the *MacDonald* case in 1965, and that they were of the opinion that there had been no substantial change in the character of the neighborhood since that time. In *MacDonald,* while apparently no dispute was raised as to the definition of the neighborhood, it would appear that this Court directed its attention to the immediate neighborhood surrounding the subject property. See *MacDonald* at p. 555.

In the case at bar, the lower court in its opinion expressly stated that because of the mass of testimony and exhibits it would not attempt to review in detail the testimony of the witnesses, much of which dealt with change. We will briefly comment on the nature of this testimony, but for the moment, we would call attention to the fact that the language employed by the lower court contains the reason as to why it was in error in not sustaining the action of the District Council which denied rezoning. The court's initial comment regarding change, stated:

> "Admittedly those changes which have occurred in the *immediate area do not require the change in zoning applied for*: however, I do not see how anyone with an open mind could say that they

were not such as to justify the change applied for." (Emphasis supplied.)

By contrast, as recently as *Wright v. McCubbin,* 260 Md. 11, 271 A. 2d 365 (1970), this Court stated:

" * * * Even if there had been some significant evidence of substantial change in the character of the neighborhood it is established that change which would support a rezoning does not compel it absent probative evidence that no reasonable use can be made of the property in its current zoning classification. *Furnace Branch Land Co. v. Board of County Commissioners of Anne Arundel County,* 232 Md. 536; *Skipjack Cove Marina v. County Commissioners,* 252 Md. 440, 453; *Cabin John Limited Partnership v. Montgomery County Council, supra.* [259 Md. 661, 271 A. 2d 174]."

Certainly, in the instant case, there was no effort made to show that reasonable use of the subject property could not be made in its current zoning classification.

We are of the opinion that the changes in the neighborhood which were advanced by the appellee to further its cause were primarily development of residential uses in the Tantallon Subdivision, which were recognized as a futile bootstrap exercise in *MacDonald,* (238 Md. at 556). This Court has frequently recognized that the development of an area along the lines contemplated in the original comprehensive zoning is not such a change as would support the finding of a substantial change in the character of the neighborhood. *Chatham Corp. v. Beltram,* 252 Md. 578, 585, 251 A. 2d 1 (1969) ; *Smith v. Board of County Commissioners,* 252 Md. 280, 284, 285, 249 A. 2d 708 (1969) ; *Helfrich v. Mongelli,* 248 Md. 498, 505, 237 A. 2d 454 (1968). Nor do we think that the construction of highway improvements, installation of sewage facilities, new schools and population growth constitute such substantial changes in this case as to prevent the issue of

change in the character of the neighborhood from being fairly debatable. See *MacDonald, supra,* at 556 and *Helfrich v. Mongelli, supra,* at 504, as to effect of highway improvement; *Smith, supra,* at 285; *Chatham, supra,* at 585, as to installation of water and sewers and *Baker v. Montgomery County,* 241 Md. 178, 185, 215 A. 2d 831 (1966) as to schools.

Additionally, we have frequently held that a substantial growth of population in the neighborhood does not, per se, prove a substantial change in the character of the neighborhood, *Hardesty v. Dunphy,* 259 Md. 718, 721, 271 A. 2d 152 (1970); *Chapman v. Montgomery, supra,* 643; *Miller v. Abrahams,* 257 Md. 126, 129, 262 A. 2d 524 (1970); *Board of County Commissioners v. Kines, supra,* at 123; *Pierpont v. Wells, supra,* at 559; *Cabin John Ltd. Partnership v. Montgomery Council, supra,* at 670; *County Com'rs v. Fair Winds,* 230 Md. 569, 587, 187 A. 2d 845 (1963); *Didlake v. Pottee,* 228 Md. 588, 591, 180 A. 2d 828 (1962).

## ISSUES OF FLOATING ZONE

The appellee seeking to ease its burden of proof would urge upon us that the R-10 classification provided by the Prince George's County ordinance is in fact a floating zone and that, as such, in order to establish its right to such a classification for the subject property the issues of "mistake or change" are irrelevant. *Huff v. Bd. of Zoning Appeals,* 214 Md. 48, 62, 133 A. 2d 83 (1957).

Judge Bowen in the lower court held that the R-10 classification as used in Prince George's County is not a floating zone. With this part of his opinion we are in accord. The lower court elaborated on this point, stating:

"* * * Although the description of the purposes it is intended to serve might apply equally to a floating zone, the fact that R-10 is delineated on the zoning maps and that there are no floating zones described as such in this county's ordinance leads the Court to conclude that R-10 is

not a floating zone. [See Prince George's County Charter, Section 708 (e).]" [1]

In the instant case the Prince George's County Code requires pre-filing and pre-approved structures in an R-10 zone, only in the event the multi-family structure exceeds 110 feet in height. Prince George's County Code, Appendix B, "Zoning", § 18.6, p. 403 (1968 Ed.). This would be inconsistent with the requirement of a floating zone as outlined by this Court in *Chatham Corp. v. Beltram,* 243 Md. 138, 220 A. 2d 589 (1966), wherein we stated:

> " * * * A floating zone is a special detailed use district of undetermined location, a district in which *the proposed kind, location, size and form of structure must be pre-approved,* and which, like a special exception use, is *legislatively predeemed* compatible with areas in which it may thereafter be located on a particular application, provided specified standards are gratified and actual incompatibility is not revealed." (Emphasis supplied.) 243 Md. at 149-150.

Apart from the question of a floating zone it would appear that the appellee failed to demonstrate that the requested R-10 classification would, at the proposed location, meet the purposes of R-10 zoning as set forth in the following language of Section 18.0 (R-10 zone) of the Zoning Ordinance:

> "The function of the R-10 zone in accomplishing the purposes of the Zoning Ordinance shall be to provide suitable sites for high density residential development, at locations indicated in the General Plan or at such other locations as are found to be suitable by the district council, and

---

1. The new charter adopted for Prince George's County which became effective in 1971, expressly prohibits any floating zone classification.

which are selected so as to provide opportunities for residence in close proximity to the principal commercial and cultural centers of the county. Among the possible methods of carrying out this purpose, the assembly and use of sites occupied by deteriorated development and judged to be in need of redevelopment shall be given preference where possible."

The record is devoid of any testimony regarding close proximity to "principal commercial and cultural centers." Nor would it appear that any use is intended to be made of a "deteriorated development * * * judged to be in need of redevelopment * * *."

Finally, the protesting property owners challenged the validity of "conditional zoning," represented by the conditions imposed as a prerequisite to the granting of the application. In view of our decision which in effect sustains the action of the District Council in denying the application there is no need to address ourselves to that issue.

> *Order reversed, appellee to pay costs.*

Barnes, J., concurring in part and dissenting in part:

I concur in the majority opinion in so far as it points out that assuming, *arguendo,* that even if there had been significant evidence of a mistake in the original comprehensive zoning or that there had been a change of conditions resulting in a change in the character of the neighborhood in which the subject site is located, the existence of such evidence—while *permitting* the legislative body to grant the requested R-10 rezoning—does not *compel* that body to grant the requested rezoning, in the absence of probative evidence that no reasonable use can be made of the property in the existing zoning classification or that the legislative body otherwise acted arbitrarily or capriciously, neither of which factors exist in the present

case. See *Wright v. McCubbin,* 260 Md. 11, 271 A. 2d 365 (1970) and cases therein cited. The fundamental difference in this regard between the present case and *MacDonald v. Board of County Commissioners,* 238 Md. 549, 210 A. 2d 325 (1965) is that in the instant case the legislative body did not grant the requested rezoning while in *MacDonald* it did. This is a great difference, indeed.

In my opinion, however, it is not clear from the record in the present case that the R-10 zone is not a floating zone and I would remand the case without affirmance or reversal under Maryland Rule 871 a to explore further this aspect of the case. The District Council proceeded upon the theory that the R-10 zone was not a floating zone and did not consider the issues which would arise under the floating zone concept. The lower court was of the opinion that the R-10 zone was not a floating zone and stated that the R-10 zones are delineated on the zoning maps, thus indicating, if this observation be correct, that it is a Euclidian rather than a floating zone. It was represented to this Court by counsel for Prestwick, Inc. in argument, however, that the R-10 zone is not delineated on the zoning maps until *after* application has been made for granting this type of zoning and the application granted by the District Council. The record in the case is silent on this and I think this aspect of the matter should receive further consideration. I do not interpret the provisions of the ordinance creating the R-10 zone as requiring pre-filing and pre-approved structures in that zone *only* in the event the multi-family structure exceeds 110 feet in height. Such pre-filing and pre-approval is undoubtedly required in that situation under § 18.6, but the last paragraph in § 18.6 provides:

> "A plan of development issued in accordance with the regulations contained in section 18.0 shall remain valid for a period of one year following the date of its approval. If at the end of that time, construction of the proposed dwellings shall not have begun, then said plan of de-

velopment shall be considered as having lapsed and shall be of no effect unless resubmitted to the planning board, and reapproved by the planning board, or the district council. All construction and development under any building permit shall be in accordance with the approved site development plan. Any departure from such plan shall be cause for revocation of a building permit or denial of an occupancy permit. Any changes in an approved plan shall be resubmitted for approval in accordance with this subsection. Construction will be deemed to have begun when all necessary excavation and piers or footings of one or more principal buildings included in the development plan shall have been completed."

Section 18.0 provides for the function and purposes of the R-10 zone, one alternative of which is to provide suitable sites for high density residential locations indicated on the General Plan. In short, the requirement of a plan of development appears to be required under the ordinance for *any application* for R-10 zoning and is not restricted to applications for buildings with a height in excess of 110 feet. This too could be considered on the remand inasmuch as, at least, the ordinance is ambiguous in this regard.

The restricted uses in § 18.1, the net minimum lot area requirements in § 18.2, the substantial requirements in § 18.3 for minimum lot frontage and in § 18.4 for front yards, as well as the required distances between multiple-family dwellings strongly suggest to me that the R-10 zone might well be a floating zone as we have defined these zones. Obviously, the provisions in regard to the R-10 zone are not as sophisticated as those used for the R-H zone; but they are in my opinion sufficiently similar to justify further proceedings to consider further this aspect of the case on a remand.

Counsel for the appellants pointed out in their brief—that "Significantly, the Prince George's County Charter, Section 708(e) provides: 'No zoning classification shall be a floating zone.'" There was no further elaboration on this statement. The Charter referred to was approved at the General Election held on November 3, 1970, and generally effective by its terms on December 3, 1970, except where noted. Section 708(e) became effective by virtue of Section 1207 on February 8, 1971. The language of Section 708 does not indicate that any of its provisions apply retroactively and in view of the presumption against retroactive application of statutes, it may well be that this curious provision of the Charter would not apply to the R-10 zone, assuming for the argument that it is a floating zone. This matter could well be further considered upon the remand.

It might be that upon such a remand further evidence might indicate that the R-10 zone was not a floating zone or, if so, the District Council might find that the necessary criteria to justify a granting of the R-10 rezoning even as a floating zone did not exist; but Prestwick should, in my opinion, have the opportunity to explore further this aspect of the case. I would remand without affirmance or reversal for this purpose, and dissent from the failure of the majority to do this.